**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ROGER ERVIN                                     *

Plaintiff                                       *

v                                               *            Civil Action No. ELH-15-2263

COLIN OTTEY, MD, *et al.*                        *

Defendants                                      *
                                              ***

**MEMORANDUM**

Plaintiff Roger Ervin, a self-represented inmate confined to North Branch Correctional Institution ("NBCI"), filed suit against defendants Colin Ottey, M.D. and Wexford Health Services, Inc. ("Wexford"),[1] pursuant to 42 U.S.C. § 1983, alleging deliberate indifference to his medical needs, in violation of the Eighth and Fourteenth Amendments.[2]  ECF 1.  In particular, Ervin complains that defendants have not adequately addressed his medical issues, related to his fall from a top bunk in January 2012.  *Id.*

Defendants have filed a motion to dismiss or for summary judgment.  ECF 11 (the "Motion").  It is supported by an Affidavit and more than 600 pages of plaintiff's medical records, filed in paper format, under seal, as Exhibit 2.[3]  On June 27, 2016, the Clerk docketed plaintiff's request for an extension—until August 20, 2016—to oppose the Motion.  ECF 24.  By Order of June 28, 2016 (ECF 25), I granted plaintiff's request for an extension, until August 1,

---

[1] The correct name is Wexford Health Sources, Inc.

[2] Plaintiff named as defendants "Jane Doe Medical Physician" and "John Doe Medical Physician."  Because the served defendants have demonstrated that plaintiff has no Eighth Amendment claim, there is no basis to proceed against the two unknown defendants.

[3] According to defendants, Ervin's actual medical record exceeds 2,000 pages.  ECF 11 at 8 n.2.

2016.  Plaintiff has filed nothing further.  But, he filed correspondence in March 2016, along with exhibits, which I shall construe as his opposition.  *See* ECF 19.

Also pending is plaintiff's motion for temporary restraining order (ECF 7, "TRO Motion"), supported by a Memorandum (ECF 7-1), plaintiff's Declaration (ECF 7-2), and other exhibits.  ECF 7-3; ECF 7-4.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons that follow, defendants' Motion, construed as a motion for summary judgment, shall be granted, and plaintiff's TRO Motion shall be denied.

## I.      Factual Background

### A.   Plaintiff's Allegations

Ervin asserts in his Complaint that "at an earlier time" he fell from his bunk at NBCI, was injured, and was treated and released from "Maryland Western Regional Medical Center."  ECF 1, ¶ 6.  He claims that since the fall, he has been experiencing multiple health problems, including severe nosebleeds, accompanied by "the right side of his body shutting down" and a loss of consciousness.  *Id*. ¶ 7.

Plaintiff states that Dr. Ottey was, at the relevant time, responsible for plaintiff's medical care and treatment at NBCI.  ECF 1 ¶ 2.[4]  He asserts that Dr. Ottey was aware of plaintiff's health issues (*id.* ¶ 8) and prescribed "pain-killers for his injuries from the fall."  ECF 1, ¶ 9.  According to Ervin, Ottey "informed [him] that he would deal with plaintiff's head conditions first, and then deal with the other problems later."  *Id.* ¶ 10.  Despite that reassurance, plaintiff states that Dr. Ottey did not diagnose or treat plaintiff's nosebleeds or other ailments, "causing

---

[4] In a letter dated March 8, 2016 (ECF 19), Ervin claims that Ottey has been "fired."  *Id.* at 1.

him to pass out." *Id.* ¶ 11.

Plaintiff alleges that he continued to complain and attempted to be seen by a medical doctor, but his efforts were unavailing. *Id.* ¶ 12. Moreover, he claims that his condition has worsened. *Id.* ¶ 13. Ervin states he has no feeling on the right side of his body; he is unable to raise his right arm completely; and his eyes are bloodshot. *Id.* ¶¶ 14-16. Despite his worsening condition, plaintiff claims that Ottey failed to treat him or send him to a specialist to determine the "root cause" of his medical problems. *Id.* ¶ 17. In other instances, Ottey and Wexford failed to return Ervin to outside specialists, as the specialists had directed. *Id.* ¶¶ 18, 29.

Plaintiff claims that he later learned "from an outside medical specialist" who examined him that he has "some sort of blockage" that requires surgery. *Id.* ¶ 21. He states that if defendants had treated him, they would have learned that he had this blockage. *Id.* ¶ 23. Further, Ervin alleges that an "outside specialist/physician" prescribed specific medications for him, which were forwarded to defendants, but defendants failed to provide the medication to plaintiff. *Id.* ¶¶ 24, 25. Instead, defendants provided "ineffective treatment that would only aggravate the problem. . . ." *Id.* ¶ 26. Plaintiff did not identify the medications prescribed by either provider, however.

According to plaintiff, he has been "suffering from these conditions since he . . . fell off his bunk." *Id.* ¶ 22. Ervin maintains that he has had little or no treatment (*id.* ¶ 19), and suggests that this is a "common practice by all of the defendants in an attempt to save money." *Id.* ¶ 20. He insists that "defendants' actions have contributed to a number of [his] injuries" (*id.* ¶ 27), and he complains that defendants failed to note his medical condition "on his I.D." card. *Id.* Plaintiff also avers that he continues to experience black-outs, numbness in his body, and redness in his eyes. *Id.* ¶ 31, and reiterates that defendants have "failed to provided [sic] the plaintiff with the

3

prescribed medical treatment . . . ."  *Id.* ¶ 30.  He explains that noting his medical condition on his I.D. card would alert prison officials and prevent injuries from occurring.  *Id.* ¶ 28.

As relief, plaintiff seeks an injunction requiring defendants to note his medical condition of glaucoma on his I.D., assignment to a single cell, and defendants' adherence to orders issued by outside medical specialists.  ECF 1 at 7.  In addition, plaintiff seeks compensatory and punitive damages.  *Id.*

## B.  Defendants' Response

Defendants' response is gleaned from their Motion; the Affidavit of Robustiano Barrera, M.D. (ECF 11-1; ECF 26),[5] and the voluminous medical records of plaintiff, submitted in paper format as Ex. 2.

Dr. Barrera is Wexford's Medical Director in Cumberland.  He also provides medical services to inmates at NCBI.  ECF 11-1, ¶ 1.  Dr. Barrera avers that plaintiff is in his mid-fifties (*id.* ¶ 5) and has a medical history of glaucoma, conjunctivitis (also known as "pink eye"), blepharitis (inflammation of the eyelids), hypertension, sinusitis, and benign nasal polyps.  ECF 11-1, ¶ 5.[6]  He is seen approximately once a week for his various medical complaints.  *Id.*  He has also received surgery and follow-up appointments with an off-site ear, nose, and throat ("ENT") specialist, Dr. Anwar Mumtaz.  *Id.*  Additionally, plaintiff received multiple diagnostic studies for the treatment and diagnosis of his medical issues, including x-rays, MRIs and CT

---

[5] In my review of the record, I noted that Dr. Barrera's Affidavit (ECF 11-1) was missing a few pages.  Therefore, defendants were asked to resubmit the Affidavit, in full.  It appears at ECF 26.

[6] Nasal polyps are common, noncancerous, teardrop-shaped growths that form in the nose or sinuses, usually around the area where the sinuses open into the nasal cavity. In most cases, nasal polyps respond to treatment with medications or surgery. Because they can recur after successful treatment, however, continued medical therapy is often necessary.  *See* http://www.webmd.com/allergies/guide/nasal-polyps-symptoms-and-treatments.

scans, and he was evaluated and treated by an off-site neurosurgeon.  *Id.*  Notably, Dr. Barrera avers that plaintiff has a "well documented history of noncompliance" with prescribed medication and medical advice.  *Id.*

Dr. Barrera's Affidavit sets forth a summary of information contained in Ex. 2.  For convenience, I will generally cite to the Affidavit, rather than to Ex. 2.

On January 30, 2012, plaintiff was found in his cell in a puddle of blood, and reported that he had fallen from his bunk.  Ex. 2 at 6-8; ECF 11-1, ¶ 7.  Plaintiff was treated for a two-centimeter laceration to the back of his head.  ECF 11-1, ¶ 7.  Plaintiff told medical staff that he could not move his back nor feel his legs, but he "flinched" when his foot was touched, indicating his sensation was intact to the lower extremities.  *Id.* at 6.  Based on plaintiff's report that he hit his head on the floor, Ervin was transported by ambulance to Western Maryland Hospital for treatment.  *Id.*

Ervin "was observed to have a full range of motion in his neck and was ambulating on his own without difficulty."  ECF 11 at 10 (citing Ex. 2 at 6-8).  He was diagnosed with a sprained neck and back and given Ibuprofen for his pain.  ECF 11 at 10; ECF 11-1, ¶ 8.  He was returned to the prison the following day.  *Id.*

At the time of plaintiff's fall in January 2012, Wexford was not the direct medical care provider under contract with the Maryland Department of Public Safety and Correctional Services ("DPSCS").  ECF 11-1, Barrera Affidavit, ¶ 4.  Rather, Wexford was the utilization review provider until July 1, 2012, when it was awarded the contract to provide direct medical care to Maryland prisoners.  *Id.*  In its earlier capacity as utilization review provider, however, Wexford was responsible only for the approval or denial of specialty medical services requested for inmates by their medical providers.  *Id.*

Following his fall, plaintiff continued to complain of headaches, right-sided numbness, and muscle stiffness in his neck and back.  ECF 11-1, ¶ 9.  Despite these reports, plaintiff's "range of motion was continually observed to be within normal limits . . . ."  *Id.*  Moreover, he "had full motor function" and he walked "without assistance and with a steady gait."  *Id.*  Plaintiff was prescribed Baclofen (a muscle relaxer) and Neurontin[7] prior to his fall and continued to receive those medications after the fall.  *Id.*  He was also provided with Naproxen, Robaxin (a muscle relaxer), and Ibuprofen, as well as hot and cold compresses to assist with his reports of pain and stiffness.  *Id.*  Despite plaintiff's complaints, his ailments did not affect his ability to engage in "activities of daily living."  *Id.*[8]

 After July 1, 2012, plaintiff received medical assignments for a bottom bunk and double handcuffs, as well as additional prescription medication of Tylenol No. 3 (acetaminophen with codeine), Mobic (an anti-inflammatory pain medication), Amitriptyline (an anti-depressant often prescribed for treatment of chronic pain), and Ultram (a pain medication).  ECF 11-1, ¶ 10.  Although plaintiff was provided physical therapy, defendants assert that he refused to perform the self-management exercises he was taught.  *Id.*

On August 9, 2013, correctional officers reported that plaintiff was lying face down in his cell and was not responding to verbal commands.  Ex. 2 at 188 – 89; ECF 11-1, ¶ 11.  Plaintiff

---

[7] Neurontin, is an anti-epileptic that is often prescribed for treatment of chronic pain.  *See* http://www.drugs.com/neurontin.html.

[8] Activities of daily living (ADLs) is defined as:

Everyday routines generally involving functional mobility and personal care, such as bathing, dressing, toileting, and meal preparation. An inability to perform these renders one dependent on others, resulting in a self-care deficit. A major goal of occupational therapy is to enable the client to perform activities of daily living. http://medical-dictionary.thefreedictionary.com/activities+of+daily+living.

was seen by Carla Buck, R.N.   *Id.*   She administered smelling salts in order to determine if plaintiff was truly unconscious.   Because plaintiff "quickly sat up" after smelling salts were administered, it was determined that he was feigning unconsciousness.   ECF 11-1, ¶ 11.   At that time, plaintiff's prescriptions for a bottom bunk and for Tylenol No. 3 had been discontinued. *Id.*   Although plaintiff claimed having pain in his legs that caused him to fall, he walked out of the medical room and back to his cell without assistance or discernible difficulty.   *Id.*

Plaintiff was referred to an ENT on January 19, 2011, for treatment of a nasal polyp, after a CT scan of his sinuses on December 29, 2010, revealed a right-sided nasal polyp.   ECF 11-1, ¶ 12.   Plaintiff was seen by Dr. Anwar Mumtaz on March 8, 2011, at Bon Secours Hospital ("BSH").   Ex. 2 at 509 – 10.   He performed a nasal endoscopy and did not observe a polyp. However, "the CAT scan" was not available to Dr. Mumtaz when he examined plaintiff.   Ex. 2 at 510.[9]   Therefore, he could not make a recommendation regarding surgery at that time.   *Id.*; *see also* ECF 11-1, ¶ 13.   Dr. Mumtaz recommended plaintiff begin using Flonase nasal spray[10] and continue his use of Neurontin for pain.   *Id.*

On June 14, 2011, Dr. Ottey requested an ENT consultation for plaintiff, due to plaintiff's complaints of frequent nosebleeds and headaches.   Ex. 2 at 515; ECF 11-1, ¶ 14.   He made another request for referral to an ENT specialist on August 11, 2011.   Ex. 2 at 517; ECF 11-1, ¶ 14.

Dr. Mumtaz saw plaintiff at BSH on September 13, 2011.   On this occasion, Dr. Mumtaz was able to review the CAT scan of plaintiff's sinus and noted that it was "basically . . .

---

[9] Throughout the record, Dr. Mumtaz refers to a CAT scan, while Dr. Barrera refers to a CT scan.   The terms are interchangeable abbreviations for Computerized Axial Tomography.

[10] Flonase or fluticasone, is a corticosteroid that prevents the release of substances in the body that cause inflammation.   *See* http://www.drugs.com/flonase.html.

unremarkable with some blockage of the middle meatus bilaterally."[11]  Ex. 2 at 519; *see* ECF 11-1, ¶ 15.  Dr. Mumtaz recommended a nasal endoscopy with possible polypectomy and plaintiff consented to the procedure.  Ex. 2 at 519.

Plaintiff was prepared for surgery.  The nasal endoscopy revealed, *inter alia*, a "nasopharyngeal mass" (Ex. 2 at 520), which was removed and biopsied.  *Id.*  Polyps were also surgically removed with cauterization (burning).  ECF 26, ¶ 15.  Plaintiff left recovery in good condition and was discharged with a prescription for Percocet to treat pain and instructions to keep his nasal passage moist through use of saline nasal spray administered five times a day.  Ex. 2 at 520; ECF 26, ¶ 15.

Dr. Mumtaz saw Ervin at BSH on November 22, 2011, for follow-up.  Ex. 2 at 527 – 28; ECF 11-1, ¶ 17.  Dr. Mumtaz noted there were no significant complications from the surgery and no significant nasal obstructions were observed.  Ex. 2 at 527.  He did not request that plaintiff return for another follow-up visit.  *Id.*

As indicated, Wexford became the medical care provider for DPSCS on July 1, 2012.  ECF 11-1, ¶ 18.  At that time, plaintiff was receiving saline nasal spray, Alphagan,[12] Xalatan,[13]

---

[11] Meatus is "an opening or passage, especially one leading to the body surface. . . .  Meatus na'si (meatus of nose) one of the three portions of the nasal cavity on either side of the septum." http://medical-dictionary.thefreedictionary.com/meatus.

[12] Alphagan is an eye drop used to treat glaucoma.  *See* http://www.drugs.com/alphagan.html.

[13] Xalatan reduces pressure in the eye and is used to treat glaucoma.  *See* http://www.drugs.com/xalatan.html.

Cosopt,[14] Robaxin, and Neurontin.  ECF 11-1, ¶ 18.   Dr. Ottey wrote a consultation request on September 18, 2012, for plaintiff to be seen again by Dr. Mumtaz.  ECF 11-1, ¶ 19.

On October 23, 2012, plaintiff was seen by Dr. Mumtaz at BSH.  Ex. 2 at 535-36;  ECF 11-1, ¶ 20.  Ervin complained of bleeding from and blockage of his left nasal cavity.  *Id*.  Dr. Mumtaz did not observe any polyps, nor did he observe any signs of bleeding, and plaintiff did not complain of sinus tenderness.  *Id*.  Nonetheless, he recommended a CAT scan and x-rays of plaintiff's sinuses, and Dr. Mumtaz also recommended that plaintiff return after the CAT scan was performed.  Ex. 2 at 535.  Additionally, Dr. Mumtaz prescribed Flonase to relieve plaintiff's symptoms.  *Id*.

Based on Dr. Mumtaz's recommendations, a request for a CT scan and a follow-up visit with Dr. Mumtaz was submitted on November 7, 2012.  Ex. 2 at 537, 539; ECF 11-1, ¶ 21.  An MRI was performed on December 12, 2012, which indicated that plaintiff had a "retention cyst" in the "inferior recess of the l[eft] maxillary antrum."  Ex. 2 at 541.

On January 8, 2013, plaintiff returned to BSH, where he was seen by Dr. Mumtaz.  A nasal endoscopy was performed.  Ex. 2 at 543; ECF 11-1, ¶ 22.  Dr. Mumtaz did not observe any signs of bleeding, and the endoscopy examination was normal.  *Id*.  He recommended that plaintiff continue using saline nasal spray and to return as needed.  *Id*.

Dr. Ottey examined plaintiff on January 26, 2013, for complaints of nosebleeds and headaches.  ECF 11-1, ¶ 30.  Dr. Ottey ordered blood pressure monitoring and prescribed Altenolol.  Ervin again saw Dr. Ottey on April 9, 2013, and reported that his headaches had improved.  *Id.* ¶ 31.  However, Dr. Ottey admitted plaintiff to the prison infirmary on December

---

[14]   Cosopt is an eye drop used to treat certain types of glaucoma.  *See* http://www.drugs.com/cosopt.html.

10, 2014, due to his elevated blood pressure and related nosebleeds. *Id.* ¶ 32. By December 11, 2014, Ervin's blood pressure had stabilized. *Id.* ¶ 33.

Plaintiff returned to BSH on March 10, 2015, and was seen again by Dr. Mumtaz. Ex. 2 at 566-68; ECF 11-1, ¶ 23. No nasal obstruction was observed, nor did the doctor find any polyps or lesions. *Id.* He diagnosed plaintiff with chronic sinusitis with possible polyp and cyst after examination revealed no nasal obstruction. Ex. 2 at 566 – 68. Although not observed by Dr. Mumtaz, he noted that plaintiff may have a possible osteoma, *i.e.*, a benign bony growth. *Id.* Dr. Mumtaz did not observe a polyp or osteoma on the CT scans provided, but they were three years old. Therefore, he recommended that plaintiff receive a new CAT scan, and for plaintiff to return after it was completed. EX. 2 at 567; ECF 26, ¶ 23.

On May 7, 2015, plaintiff received a CT scan at BSH, without contrast. EX. 2 at 583 – 88. The results showed no facial fractures, bony formations, or mass. *Id.*at 583. But, it revealed mild mucosal thickening of the sinuses, thickening of the left maxillary sinus, and a mild chronic deformity on the left medial wall. *Id.* No abnormalities were detected in the visualized portion of the brain or nasopharynx. *Id.* Based on the test results, plaintiff was diagnosed with "Mild chronic sinus disease." *Id.*

Dr. Mumtaz again saw plaintiff on July 14, 2015. Ex. 2 at 575–77. He noted that plaintiff exhibited slight nasal speech patterns and had nasal congestion. *Id.* The examination revealed no pus or sinus tenderness nor any tumor or bleeding. However, the recent CT scan revealed a cyst in the left maxillary sinus. *Id.* Based on plaintiff's reports of fainting spells, Dr. Mumtaz recommended that plaintiff receive a neurological evaluation. *Id.* Further, he noted that if the neurological consultation was normal, plaintiff was a possible candidate for "turbinate

cautery with coblation,[15] balloon sinuplasty and nasal endoscopy with biopsy of the cyst."  *Id*. Although plaintiff specifically requested a prescription for Tylenol No. 3, Dr. Mumtaz only recommended use of Flonase.  *Id*.  Based on Dr. Mumtaz's recommendation, Ottey submitted a request for plaintiff to be seen by a neurologist.  *Id*.

Dr. Ottey saw plaintiff on July 30, 2015, for blood pressure related fainting episodes. ECF 26, ¶ 34.  Dr. Ottey recommended a neurological evaluation.  *Id*.

On August 20, 2015, plaintiff was seen by Harjit Bajaj, M.D., a neurologist at BSH.  Ex. 2 at 580 – 81.  Plaintiff's neurological examination was normal and Dr. Bajaj noted that the cause of the fainting spells was not clear.  *Id*.  He recommended that plaintiff undergo an MRI and an EEG to rule out seizures as a cause and also recommended x-rays of plaintiff's lumbar spine and cervical spine.  *Id*. at 581.  In addition, Dr. Bajaj recommended Neurontin and Baclofen.  *Id*.

Dr. Ottey saw Ervin on October 1, 2015, for a follow-up visit related to the neurological evaluation. Ex. 2 at 493–94; ECF 26, ¶ 35.  Dr. Ottey noted the recommendation for an MRI and EEG and recommended proceeding with the MRI first.  *Id*.

Plaintiff had the MRI on November 11, 2015.  Ex. 2 at 589–90; ECF 26, ¶ 36.  The results revealed that plaintiff has a "Small polyp Retention Cyst in the left maxillary sinus."  *Id*. at 589.  Dr. Mahboob Ashraf, a treating physician at NBCI, noted he would discuss the results with Dr. Ottey regarding how to proceed.  ECF 26-1, ¶ 36.

In addition to the issues with plaintiff's sinuses, he is diagnosed with chronic hypertension, but refuses to comply with the prescribed medication and medical advice to treat it.

---

15 "Coblation" is an advanced technology that reduces inflammation of the soft tissue in the nasal cavity and sinuses.  *See* http://www.nceent.com/ear-nose-throat/nasal-coblation.

ECF 11-1, ¶ 5; ECF 26, ¶ 37.  Dr. Barrerra, Wexford's Medical Director in Cumberland, opines that plaintiff's frequent nosebleeds, headaches, and fainting spells "are a direct result of plaintiff's uncontrolled hypertension and related noncompliance."  ECF 26, ¶ 37.  In his view, these symptoms are not side effects of sinusitis.  *Id*.  Moreover, he opines that plaintiff has received appropriate medical care "within the applicable standard of care."  *Id.* ¶ 39.

## II.   Standards of Review

### A.   Summary Judgment

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger*, 510 F.3d at 450.  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  When, as here, the movant expressly captions its motion "in the alternative" as one to dismiss or for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that  conversion under Rule 12(d) may occur; the court "does not have an obligation to

notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[16]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d at 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. V. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see Putney v. Likin*, _____ Fed. App'x _____, 2016 WL 3755783, at *4 (4th Cir. July 14, 2016). To raise

---

[16] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not

always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted); *see also Putney*, 2016 WL 3755783, at *5; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Harrods*, 302 F.3d at 244-45 (internal citations omitted).   And, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 2016 WL 3755783, at *5.

Plaintiff has not filed an affidavit under Rule 56(d). Moreover, I am satisfied that it is appropriate to address the defendants' motion as one for summary judgment, as this will facilitate resolution of the case.

Summary judgment is governed by Fed. R. Civ. P. 56(a).  It provides, in part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.  *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)),

*cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore,  in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'"affirmative

obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## B.  Injunctive Relief

A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).  To obtain a preliminary injunction, a movant must demonstrate:  1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest.  *See Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

## III.    Discussion

## A.  Eighth Amendment Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see King v. Rubenstein*, ____ F.3d ____, 2016 WL 3165598, at *6 (4th Cir. June 7, 2016).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate

indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted, objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *King*, 2016 WL 3165598 at *6. As the *King* Court recently reiterated, "The requisite state of mind is . . . 'one of deliberate indifference to inmate health or safety.'" *King*, 2016 WL 3165598, at *7 (citation omitted). Although this "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835).

In order "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or

inaction." *Lightsey*, 775 F.3d at 178.  In other words, deliberate indifference requires a showing that the defendant disregarded a substantial risk of harm to the prisoner.  *Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001).

The Fourth Circuit has explained:  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).  The Court has also said:  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer* 511 U.S. at 844).  However, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105; *see Makdessi v. Fields*, 789 F.3d 126, 133, (4th Cir. 2015).  And, "[a] prison official's subjective actual knowledge [of a risk] can be proven through circumstantial evidence. . . ." *Id.* at 134.

The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.  Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.*; *see also Young*, 238 F.3d at 575.  In *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), the Court said: "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences. . . .  To lower this threshold would thrust federal courts into the daily practices of local police departments."

19

Moreover, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Even if the requisite subjective knowledge is established, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000 (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Notably, "[a] prisoner's disagreement with medical providers about the proper course of treatment does not establish an Eighth Amendment violation absent exceptional circumstances." *Lopez v. Green*, PJM-09-1942, 2012 WL 1999868, at *2-3 (D. Md. June 4, 2012) (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)); *see Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Moreover, "any negligence or malpractice on the part of … doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Although the Eighth Amendment proscribes deliberate indifference to a prisoner's serious medical needs, it does not require that a prisoner receive medical care by a provider of his choice. Rather, the right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

In correspondence from plaintiff, construed as an opposition to the Motion, he relies in large part on rumors, innuendo, and unsupported allegations of corruption among medical staff

to support his claim that his condition has not been appropriately treated.  ECF 19 at 1 – 2.   He claims that "the people whom (sic) get jobs with Wexford are related by blood, social, economic, and political bonds" and that Dr. Ottey was fired for "writing prescriptions for guards."  *Id.* at 1. Further, he alleges that clothing items that cannot be identified as "prison wear" are "being worn by staff and their children."  *Id*. at 1 – 2.  Plaintiff also maintains that medication meant for use by prisoners is taken by Wexford staff to give to their family, friends, and staff, and to cover up the claims that prisoners refuse their medication.  *Id*. at 2.  He states this is especially true for medications prescribed for pain or chronic illnesses, like hypertension and diabetes.  *Id*.

With regard to the condition of his sinuses, plaintiff stated in his correspondence of March 8, 2016 (ECF 19) that he recently received an EEG and is waiting to see if the neurologist clears him for surgery.  *Id*. at 1.  As he waits, however, plaintiff claims this his condition continues to worsen.  *Id.*  He takes issue with the fact that it has taken three years since the fall in his cell for him to receive a diagnosis.  *Id*.

Notably, plaintiff disagrees with his diagnosis of hypertension and attributes his health problems to the presence of a cyst in his sinus.  *See*, *e.g.*, ECF 19-1 at 4 (health care visit of 9/9/14).  But, when encouraged to comply with the medications prescribed for hypertension, plaintiff refused and maintained "adamantly" he needed prescriptions for Neurontin and Tylenol No. 3.  *Id*.  As the record reflects, however, those medications were not provided because there was nothing to indicate at that time that they were needed.  *Id*.  Certainly, as Ex. 2 reflects, there were many other occasions when pain medication was prescribed for Ervin.

The undisputed, objective evidence in this case indicates that plaintiff's sinus issues pre-date the fall in his cell; he has been provided extensive treatment, including numerous visits with private medical specialists; he has had various diagnostic tests and surgical procedures; and his

symptoms of fainting spells, nosebleeds, and right-side numbness have been diagnosed as symptoms of his hypertension.  In addition, plaintiff's hypertension is not being treated with prescribed medications because plaintiff refuses to take those medications.

Plaintiff's disagreement with the course of treatment provided does not suffice to state a constitutional claim.  The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely desirable." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir.1977).  "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir. 1970)).  There are no exceptional circumstances evident in this case.  Indeed, it is difficult to imagine how plaintiff's demands might be satisfactorily met outside of simply prescribing narcotic strength pain medication without regard to whether Ervin truly needs it.

It bears repeating that the medical opinion in this case is that plaintiff's troubling symptoms are the result of his own abject refusal to accept treatment for his hypertension. Whether staff engage in the practices alleged by plaintiff has no bearing on the barrier to effective treatment that plaintiff himself has erected.

**B.  TRO Motion**

In his motion for temporary restraining order (ECF 7) plaintiff seeks an order requiring defendants to maintain his assignment to a lower bunk because he has glaucoma and to comply with existing medical orders for his treatment. With regard to his medical treatment, plaintiff states that "defendants have set an appointment that should have been undertaken long ago."

ECF 7-1 at 3.   Further, he maintains that defendants have failed to conform with unspecified orders issued by a specialist and have ignored a serious medical condition.  *Id.*

It is not the role of this court to manage either the decisions involved in medical care of prisoners nor their housing assignments.  It is clear from the TRO Motion that plaintiff is already receiving that which he moves this court to order.   To the extent that he fears those accommodations will be eliminated, the TRO Motion fails to state a viable basis for injunctive relief.   "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at, 22 (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (*per curiam*)).  The motion shall be denied.

## C.  Conclusion

Defendants are entitled to summary judgment in their favor.  Plaintiff is not entitled to a TRO.  A separate Order follows.


<u>August 18, 2016</u>                          _____/s/_____
Date                                            Ellen L. Hollander
                                                United States District Judge

23